**UNITED STATES**

v.

**Ewan BRYCE.**

**No. 3:97CR249(RNC).**

United States District Court, D. Connecticut.

April 6, 2001.

David A. Ring, U.S. Attorney's Office, Hartford, CT, John H. Durham, Peter D. Markle, U.S. Attorney's Office, New Haven, CT, for U.S.

Salvatore J. Petrella, Cromwell, CT, for defendant.

### MEMORANDUM OPINION

CHATIGNY, District Judge.

At a resentencing on February 23, 2001, the defendant's sentence for conspiracy to distribute cocaine was increased to the statutory maximum of twenty years based on a finding that in an attempt to avoid being convicted of that offense he murdered a government witness.[1] Before the resentencing, a jury had acquitted the defendant of the murder. However, because the evidence that he killed the victim amply satisfies the preponderance standard applicable to findings by a sentencing judge, imposing the statutory maximum was required by the guidelines unless the mandate or other controlling authority precluded an increase in the sentence. Finding no such bar in the mandate or relevant case law, I concluded that whatever expectation the defendant might have had in not being subjected to increased punishment did not overcome the societal interest in imposing a sentence "that appears just in light of the latest and best information." *United States v. Coke*, 404 F.2d 836, 843 (2d Cir.1968) (en banc).

In accordance with 18 U.S.C. § 3553(c), the reasons for the increased sentence were stated in the presence of the defendant at the hearing. Usually such an oral statement is sufficient for all purposes. However, in the special circumstances of this case, it is necessary to demonstrate that the increase is based on new information that was not available at the time of the first sentencing, and the evidence justifying the increase must be made part of the record to ensure that the basis for the sentence may be fully reviewed on appeal. *See North Carolina v. Pearce*, 395 U.S. 711, 726, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969). This memorandum serves those purposes. In addition, I take this opportunity to explain why the increase does not run afoul of the mandate or relevant precedent.[2]

### Facts

In December 1997, a grand jury returned an indictment charging the defendant with conspiracy to possess with intent to distribute, and to distribute cocaine, 21 U.S.C. § 846 (count one), and possession with intent to distribute, and distribution of, cocaine, 21 U.S.C. § 841(a)(1) (count two). The defendant was released on bond and trial was scheduled to start in mid-

---

1. *See* U.S.S.G. § 1B1.3(a)(1) (guideline offense level shall be determined based on all acts committed by defendant during commission of offense or in course of attempt to avoid responsibility for offense).

2. The defendant has filed a notice of appeal. The filing of the notice prevents me from altering the judgment but does not prevent me from filing this memorandum.

April. On March 15, 1998, a confidential informant named Jermaine Fitzpatrick who had assisted in the investigation of the case was murdered. The defendant's trial went forward on schedule and resulted in his conviction on both counts. In August 1998, he was sentenced on each count to imprisonment for 123 months and supervised release for five years, the sentences to run concurrently. He was also ordered to pay a special assessment of $100 on each count for a total of $200.

The defendant appealed attacking both counts of conviction. In an opinion issued in August 1999, the court of appeals affirmed the judgment on count one, reversed the judgment on count two for insufficiency of the evidence, and remanded for resentencing. *See United States v. Bryce,* 208 F.3d 346 (2d Cir.1999). The government filed a petition for rehearing but the defendant did not. In due course, the court of appeals issued an amended opinion adhering to its original decision and remanding the case with the following instructions: "Accordingly, we reverse Bryce's conviction for possession with intent to distribute and distribution (Count Two), affirm the district court's judgment as to Bryce's conspiracy conviction (Count One), and remand for resentencing." *See United States v. Bryce,* 208 F.3d 346, 356 (2d Cir.1999). Later, a mandate issued containing the following language: "it is now hereby ORDERED, ADJUDGED,

and DECREED that the judgment of said district court be and it hereby is affirmed in part, reversed in part, and the case is remanded to the district court for further proceedings in accordance with the opinion of this court."

While the appeal was pending the defendant was indicted for murdering Fitzpatrick with intent to prevent him from testifying at the drug trial, 18 U.S.C. § 1512(a)(1)(A), and with intent to retaliate against him for providing information to law enforcement, 18 U.S.C. § 1513(a)(1)(A). *See* Indictment, *United States v. Ewan Bryce,* No. 3:99–CR–238 (RNC).[3] The murder case was transferred to me with the defendant's consent because it related to the underlying drug case then on appeal. In the course of the murder trial, the defendant took the stand. He admitted his involvement in cocaine trafficking (which he had previously denied), but denied killing Fitzpatrick. The jury returned a verdict finding that the defendant's guilt had not been proven beyond a reasonable doubt. The defendant then appeared for resentencing in this case.[4]

Before the resentencing, both sides submitted papers seeking a new sentence on the surviving count of conviction (i.e., the conspiracy count). The government asked for a substantial increase for relevant conduct on the ground that the defendant killed Fitzpatrick to prevent him from tes-

---

**3.** In compliance with the *Pearce* requirement that the factual data underlying the increased sentence be made a part of the record for appellate review, *see* 395 U.S. at 726, 89 S.Ct. 2072, I am directing that the record in this case be enlarged to include materials from the record in the murder case, specifically, the indictment and transcripts of the testimony of the following witnesses: Ewan Bryce, Sean Crowe, Kawayne Gore, Larry Huff, Darren Johnson and Travell Leonard. Additional materials can be made part of the record on request.

**4.** At the resentencing, it was suggested that the government had manipulated the scheduling of the resentencing to ensure that it did not occur until after the murder trial. However, the court's decision to defer the resentencing until after the trial was the product of a joint proposal of the parties, which appeared to suit the defendant's interests at the time.

tifying in this case. The defendant sought a sentence reduction on the grounds that his testimony in the murder case entitled him to credit for acceptance of responsibility under the guidelines, and he had suffered extraordinary emotional distress as a result of being charged with a capital offense he did not commit.[5]

Neither side's papers specifically addressed the question whether the sentence on the conspiracy count could be altered if the sentences previously imposed on the two counts were not interrelated. That question needed to be addressed in light of *United States v. Pisani*, 787 F.2d 71, 75–76 (2d Cir.1986), which declined to remand a case for resentencing on one count after unrelated counts had been dismissed. Accordingly, the hearing was adjourned pending further briefing. The government subsequently submitted a supplemental brief in support of its view that the sentencing had to be de novo. The defendant responded that the terms of the mandate made the sentence on the conspiracy count untouchable.

At the sentencing hearing, the parties were asked to present argument on two basic issues: whether the sentence previously imposed on the conspiracy count could be increased; and, if so, whether the defendant should be sentenced based on the guideline for first degree murder, U.S.S.G § 2A1.1. After further consideration of the parties' positions, as fleshed out during oral argument, the defendant was sentenced de novo based on that guideline, which increased the offense level to 43. At that level, the guideline sentence is life imprisonment. However, the sentence could not exceed the statutorily authorized maximum of twenty years. *See*

U.S.S.G. § 5G1.1(a). Considering the seriousness of the defendant's conduct, and the strength of the government's showing, I saw no reason to depart downward and therefore imposed the statutory maximum.

*Discussion*

■ The Supreme Court has emphasized that to ensure an absence of vindictiveness, a judge must demonstrate that an increased sentence following an appeal is warranted by new facts concerning the defendant. *See Pearce*, 395 U.S. at 725–26, 89 S.Ct. 2072. Here, the new facts concern the defendant's murder of Fitzpatrick to prevent him from testifying. At the time of the initial sentencing, nobody suggested that the defendant had killed a government informant in an attempt to prevent him from testifying, and the government did not have the means of proving that the defendant had killed Fitzpatrick for that purpose.[6] The evidence now before the court readily establishes by at least a preponderance that the defendant did kill Fitzpatrick in an attempt to avoid being convicted in this case.

The following facts concerning the murder are essentially undisputed. Fitzpatrick was killed at about 1:47 a.m. in the parking lot of the Ranch House restaurant in Hartford. He was shot eleven times in the face and chest area at very close range with a .40 caliber pistol made by either Taurus or Ruger.

Fitzpatrick spent the last few hours of his life in the company of Larry Huff, who was a close friend of his, and the defendant, with whom he was not known to socialize. The defendant had arranged for the three men to go out that night so he could speak with Fitzpatrick about the

---

5. The defendant also argued that his sentence should be reduced in light of *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

6. The government's key witness, Larry Huff, did not cooperate until after the first sentencing.

drug case, which was scheduled to go to trial within a matter of weeks.

Shortly before the shooting, the three arrived at the parking lot in Huff's car in order to drop off the defendant, who had left his car at the lot earlier in the evening. The defendant, who was sitting in the front seat, announced that he was going home and got out. Fitzpatrick, who was sitting in the back seat, followed the defendant out of the car in order to move to the front. Within seconds of Fitzpatrick's exit, the shooting began. The force of the gunfire propelled Fitzpatrick's body back through the open door of Huff's car and he wound up lying on the front seat with his legs sticking out the open door.

In the context of these undisputed facts, the parties dispute whether Fitzpatrick was killed by the defendant or some unknown assailant. The government contends that the defendant shot Fitzpatrick while wearing gloves, drove from the scene to dispose of the murder weapon and gloves, then returned immediately, pretending that he had never left. I am persuaded that the government is correct.

The witness on whom the government primarily relies is Larry Huff, Fitzpatrick's friend. *See* Transcript of Testimony of Larry Huff, Sept. 20–21, 2000, at 10. Huff has testified that when he and Fitzpatrick met the defendant at the Ranch House, the defendant said to Fitzpatrick, "the word is out that you snitched, that you're telling on people, [and] that you're working with the Government." *Id.* at 30–31. Fitzpatrick denied the accusations and the defendant said he wanted Fitzpatrick to meet with his criminal lawyer to discuss the matter. *Id.* This "same conversation" continued for fifteen to twenty minutes until the three arrived at their destination, the parking lot of a nightclub, where it continued for another ten minutes. *Id.* at 32–33. After attend-

ing a party at the club, the three got back together in Huff's car to return to the Ranch House to drop off the defendant. On arriving at the Ranch House, Huff pulled in next to the defendant's car. *Id.* at 39. For the next half hour, the defendant continued to have the "same conversation" with Fitzpatrick concerning the drug case. *See id.* at 39–40.

Huff testified that after the defendant and Fitzpatrick got out of the car at the Ranch House, he heard Fitzpatrick say, "What the F." *Id.* at 43–44. Huff turned and saw Fitzpatrick's arm go up "like he was trying to block something." *Id.* at 44. Huff then saw sparks and heard gunfire and realized that the defendant was shooting Fitzpatrick at point blank range. *See id.* Huff could not see the defendant's face because of the roof of the car, but the defendant's clothing was visible to him. *Id.* at 44–45. Huff fled into the woods to avoid being shot himself. *Id.* at 45. After the shooting stopped, he heard the sound of "some tires screeching, like somebody pulling off." *Id.* at 47. Huff returned to the parking lot in shock. On encountering the defendant, he looked at him and said, "What the F?" *Id.* at 50. The defendant responded by looking Huff in the eyes and saying repeatedly, "What you mean what the F?" *Id.* at 51.

I credit Huff's testimony. His account is consistent with videotapes taken from security cameras at a gas station across the street from the crime scene. The videotapes show witnesses responding to the sound of gunfire by looking in the direction of the place where Huff's car was parked. The witnesses then turn their heads to follow the path of a car leaving the scene. The videotapes do not show the getaway car but witnesses have described it as a small black car, a description that matches the car the defendant was driving.

In the wake of the shooting, the defendant and Huff gave statements to investigators denying that they saw what happened. The defendant subsequently engaged in a course of conduct reflecting a concern on his part that Huff stick by that story. Among other things, he bought Huff a car to replace the one that had been seized as evidence, *see id.* at 57–60, and brought him job applications, including one from the place where the defendant was working. The defendant told Huff he "should stop hustling [i.e. selling drugs] because the Government [would] try to bust [him] and have [him] tell them what happened at the murder." *Id.* at 61. Later, after the defendant began to serve his sentence in this case, he asked his close friend Travell Leonard to contact Huff and tell him to "be careful." *See* Transcript of Testimony of Travell Leonard, Sept. 20, 2000, at 15. Leonard delivered the message, telling Huff that the defendant wanted to know whether he was "talking to anybody." *See* Huff Tr. At 63.

The defendant had an obvious motive for preventing Fitzpatrick from testifying. Darren Johnson has testified that Fitzpatrick helped arrange the cocaine transaction between Johnson and the defendant that was captured on the wiretap in this case. *See Transcript of Testimony of Darren Johnson,* Sept. 25, 2000, at 6–8. Before Johnson and the defendant were indicted, the defendant visited Johnson in jail. *See id.* at 8. During the visit, Johnson told the defendant that they were going to be indicted, that Fitzpatrick was the one who had set them up, and that the defendant should leave town. *Id.* at 10–11. After the indictment was issued, the defendant visited Johnson again. *Id.* at 12. The defendant said "he'd do anything to beat his case," *id.* at 13, which exposed him to a mandatory minimum sentence of ten years, and asked if Johnson knew

where Fitzpatrick "hung out." *Id.* Before leaving he told Johnson, "[O]nce I find Jermaine, [you] know what time it [is]." *Id.* at 13.

Johnson's testimony is consistent with the testimony of Kawayne Gore, a lifelong friend of the defendant. *See* Transcript of Trial Testimony of Kawayne Gore, Sept. 25, 2000, at 4–5. At the murder trial, Gore testified that he accompanied the defendant on one of the defendant's trips to see Johnson in jail. *Id.* at 13. After speaking with Johnson, the defendant reported to Gore that Johnson had informed him that Fitzpatrick might be "snitching." *Id.* at 14. The defendant appeared to be "shocked," *id.* at 15, and asked Gore whether he should kill Fitzpatrick. *Id.* at 15–16.

Gore also testified that in 1997, the year before Fitzpatrick was killed, he saw the defendant with a pistol that the defendant described as a "Taurus forty." *Id.* at 22. As mentioned earlier, the weapon used to kill Fitzpatrick was a .40 caliber pistol made by either Taurus or Ruger.

The defendant has testified that he did not kill Fitzpatrick and did not see who did. *See* Transcript of Testimony of Ewan Bryce, Sept. 26, 2000, at 23. According to his account, he got out of Huff's car, got into his own (which was parked next to Huff's), and was starting to back up when he heard a "pop." *Id.* at 19. He ducked, spun his car around, drove to the other side of the lot, parked, jumped out, saw a crowd looking at Huff's car, and started to go back there to "figure out what the crowd, what everybody was looking at." *Id.* at 19. He saw Huff coming from the side of the building, followed him into the Ranch House and asked him, "Yo, what happened?" *Id.* at 19–20. He then called 911. This line of testimony, which

strained credulity, was effectively impeached on cross-examination.

At the murder trial, the defendant told the jury that he had no motive to kill Fitzpatrick. He testified that although he sold crack cocaine to Fitzpatrick, and heard people saying Fitzpatrick was a snitch, he "really didn't have any concern with him," *id.* at 12, and actually wanted to use him as a character witness. See *id.* at 73. The defendant's implausible testimony on this key point is contradicted by the credible testimony of Johnson, Gore and others, and must be rejected as untrue.

My assessment of the credibility of the defendant's account is influenced by his conduct in connection with the initial sentencing in this case. After he was convicted, the defendant sent me a letter blaming a biased jury for presuming him to be guilty when in fact he was innocent. *See* Presentence Report, Letter from Ewan Bryce of 5/19/98 ("With all due respect, I don't think I stood a chance from day one with the jury. I also believe that they, the jury, presumed me guilty from the simple fact of the Government having me in court, period. To inform you, I turned myself into the authorities after learning about my indictment, and after finding out the charges I knew that I was innocent."). Several months later, when he appeared in court for the sentencing hearing, he made a tearful statement asserting once again that the case against him was based on lies and that the jury had wrongly assumed he was guilty. *See* Transcript of Sentencing, No. 3:97–CR–249(RNC), at 69–73. The defendant's admissions during his trial testimony in the murder case concerning his cocaine trafficking activities in 1997 estab-

lish that his previous statements were false.[7]

■ Because the record establishes by at least a preponderance that the defendant killed Fitzpatrick to prevent him from testifying in this case, relevant conduct that clearly calls for a substantially higher sentence than the one he received in the first instance, the question remains whether he could be given an increased sentence on the conspiracy count following his partially successful appeal. As discussed at the sentencing hearing, I believe that in the circumstances presented here the sentence could be increased in accordance with the guidelines.

■ As noted earlier, the defendant opposed an increase in the sentence on the ground that it was precluded by the mandate. Though that interpretation of the mandate is plausible, it makes more sense to construe the mandate as vacating the original sentence and remanding for de novo sentencing. As the government emphasizes, the Second Circuit has adopted a mandate rule that permits, if it does not require, de novo sentencing unless the mandate specifically limits the scope of resentencing. *See United States v. Atehortva*, 69 F.3d 679, 685 (2d Cir.1995) ("[T]he resentencing was appropriately treated as a de novo sentencing, for the remand did not specifically limit the scope of the sentencing."). The mandate in this case contains no such limiting instructions. If the court of appeals intended that nothing be done except vacating the sentence on count two, it could have exercised its authority to vacate that part of the sentence without a remand, *see* 28 U.S.C. § 2106, or remanded with a limiting in-

---

7. At the murder trial, the defendant called a surprise witness who purported to be an eyewitness to the murder. She claimed that she saw an unidentified person pull up in a car on the street in front of the Ranch Rouse, run to

Huff's car, fire the shots, then flee. Based on her demeanor while testifying, and the content of her testimony, I reject her testimony as unreliable and inaccurate.

struction. Because it did neither of those things but instead remanded for resentencing with no limiting instructions, the mandate did not preclude an increase in the sentence warranted by new information about relevant conduct. *See United States v. Bryson,* 229 F.3d 425, 426 (2d Cir.2000) ("The Second Circuit has consistently held that a court's duty is always to sentence the defendant as he stands before the court on the day of sentencing.").

■ At the resentencing, the defendant argued that he acquired a legitimate expectation of finality in his original sentence as of the date the government filed its petition for rehearing in the court of appeals and that imposition of a higher sentence would therefore violate the Double Jeopardy Clause. The defendant's argument is somewhat inconsistent with his submission seeking a reduced sentence. However, assuming the defendant had a subjective expectation of finality once the government requested rehearing, his interest is not controlling. In *Atehortva,* the Second Circuit wrote, "[t]he Supreme Court and this court have clearly held that the double jeopardy provision has no application in this context. *See Pearce,* 395 U.S. at 719–21, 89 S.Ct. 2072; *Coke,* 404 F.2d at 839–41." 69 F.3d at 687. *Atehortva* is distinguishable because the three counts of conviction in that case were "inextricably tied" to each other for purposes of determining the sentencing range under the guidelines. *See id.* at 685. However,

that distinction does not justify applying the Double Jeopardy Clause here. As in *Atehortva,* the double jeopardy provision does not apply because the defendant is not "being given a second punishment in a proceeding initiated against his will." *Coke,* 404 F.2d at 841.[8]

The Supreme Court has made it clear that due process limitations on imposition of increased punishment after a successful appeal are based on the need to avoid an appearance of judicial vindictiveness. *See Texas v. McCullough,* 475 U.S. 134, 106 S.Ct. 976, 89 L.Ed.2d 104 (1986) (presumption of vindictiveness does not apply if different judge imposes higher sentence); *Wasman v. United States,* 468 U.S. 559, 104 S.Ct. 3217, 82 L.Ed.2d 424 (1984) (presumption adequately rebutted by consideration of intervening conviction); *Chaffin v. Stynchcombe,* 412 U.S. 17, 93 S.Ct. 1977, 36 L.Ed.2d 714 (1973) (presumption inapplicable to resentencing by jury). When the record on resentencing contains new information about relevant conduct requiring a higher sentence under the guidelines, an increase in the sentence may be readily justified as the product of applicable law and the exercise of objectively reasonable sentencing discretion. That is the case here.

In *Coke,* the Second Circuit held that a higher sentence may lawfully be imposed after a retrial based on conduct of the defendant occurring after the first sen-

---

8. In *Coke,* the Second Circuit found it unnecessary to say whether the rule permitting a defendant to be retried following the setting aside of a conviction is based on "the fiction of a 'waiver' or on the more nearly satisfactory basis of 'continuing jeopardy,' *see* Mayers and Yarbrough, *Bis Vexari: New Trials and Successive Prosecutions,* 74 Harv.L.Rev. 1, 5–8 (1960)[,]" because "it suffices that freedom would be a disproportionate reward for a trial error." 404 F.2d at 839. In cases involving resentencing after a defendant's partially suc-

cessful appeal, like this case and *Atehortva,* the best explanation for why the double jeopardy provision does not apply appears to be the concept of continuing jeopardy. *See* Mayers and Yarbrough, 74 Harv.L.Rev. at 7 ("If the evil about which the framers were concerned was harassment of a defendant by *successive prosecutions for the same activity,* jeopardy properly may be thought of as continuing until the final settlement of any one prosecution.").

tencing or facts that were previously unknown because of some action on the part of the defendant. 404 F.2d at 846. The court could "perceive no reason why 'there must be repose *** as to the severity of the crime,' when it is the defendant who has shattered the repose." *Id.* at 846 quoting *Marano v. United States,* 374 F.2d 583, 585 (1st Cir.1967) (internal citation omitted). And the court thought it entirely proper that a defendant should have to take the risk of a higher sentence into account in deciding whether to appeal. *Id.* Exercising its supervisory power to protect the interest that appeals not be deterred, the court restricted the practice of imposing increased sentences to "cases truly calling for it." *Id.* at 845. More recently, the court has stated:

> Though the prospect of increasing one component of the sentence creates an arguable deterrent to a challenge to another component that might be unlawful, we think the legitimate purposes of sentencing counsel against an absolute rule barring all increases of any component after another component has been successfully challenged.

*United States v. Bohn,* 959 F.2d 389, 394–95 (2d Cir.1992). Here, the increase is truly called for and although it is severe the resulting sentence is not.

What remains for consideration is the decision in *Pisani.* In that case, the court of appeals rejected the government's attempt, in the absence of a cross-appeal, to obtain an increased sentence on one count after the defendant successfully appealed his conviction on numerous other counts, which had been joined as a matter of trial convenience. *See* 787 F.2d at 75–76. The court decided that just because the sentences on the invalidated counts were higher than the sentence on the surviving count did not mean that consideration of an increased sentence on the surviving

count was warranted. *See id.* at 76 and n. 5. *See also Bohn,* 959 F.2d at 394 ("As we ruled in *Pisani,* ..., the Government cannot obtain an increase in a sentence on one count in response to a reduction in a sentence on an unrelated count."). In this case, the defendant's sentence on count one has been increased, not because the concurrent sentence on count two has been vacated, but because of new information concerning relevant conduct on the part of the defendant that mandates an increase under the guidelines. *Pisani* does not immunize a defendant against such an increase.

*Conclusion*

For the foregoing reasons, the increased sentence imposed on the defendant is proper.